**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| ACTIVE DAY OH, INC., ADSC HOLDINGS, INC., and PERSON CENTERED SERVICES, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | C.A. No. N22C-08-064 SKR CCLD |
| GREGORY WEHR and KENNETH ALBERT, | ) ) ) ) | |
| Defendants. | ) ) | |

Submitted: May 22, 2024
Decided: June 27, 2024

## <u>MEMORANDUM OPINION AND ORDER</u>

*Upon Consideration of Defendants' Motion for Summary Judgment:*

## **DENIED.**

Margaret M. DiBianca, Esquire, CLARK HILL PLC, Wilmington, Delaware, John F. Marsh, Esquire, and Jolene S. Griffith, Esquire, BAILEY CAVALIERI LLC, Columbus, Ohio, and Tyler J. Dunphy, Esquire, ACTIVE DAY OH, INC., Trevose, Pennsylvania, *Attorneys for Plaintiffs Active Day OH, Inc., ADSC Holdings, Inc., and Person Centered Services, Inc.*

Michael D. DeBaecke, Esquire, and Randall J. Teti, Esquire, ASHBY & GEDDES, P.A., Wilmington, Delaware, *Attorneys for Defendants Gregory Wehr and Kenneth Albert.*

**RENNIE, J.**

## INTRODUCTION

This memorandum opinion considers and denies in full the motion for summary judgment (the "Motion") filed by Defendants Gregory Wehr ("Wehr") and Kenneth Albert ("Albert"). Defendants sold their ownership interests in Person Centered Services, Inc. ("PCS"), to Active Day OH, Inc. ("Active Day"), through a stock purchase agreement (the "SPA") that includes a seven-year non-competition provision. In the underlying action, Plaintiffs assert that Defendants breached this provision—and tortiously interfered with Active Day's agreements with a third party—by helping a former PCS employee gain regulatory approval to start a competing business.

## FACTUAL OVERVIEW[1]

Plaintiff Active Day, a Delaware corporation based in Pennsylvania, provides adult day care services nationally for the elderly and adults with disabilities. Plaintiff ADSC Holdings, Inc. ("ADSC"), a Delaware corporation based in Pennsylvania, is the parent company of Active Day. Plaintiff PCS, an Ohio corporation based in Ohio, operates fifteen adult day care centers in the State of Ohio and provides related transportation services.

---

[1] These facts are largely drawn from the Complaint, Defendants' Opening Brief in Support of Motion for Summary Judgment, Plaintiffs' Answering Brief in Opposition to Defendants' Motion for Summary Judgment, Defendants' Reply Brief in Support of Motion for Summary Judgment, and attached exhibits.

Defendant Wehr is an individual who resides in Ohio. Defendant Albert is an individual who resides in South Carolina. Defendants previously owned all of the issued and outstanding capital stock of PCS.

The Ohio Department of Developmental Disabilities (the "DODD") sets licensing requirements to open an adult day care center. The DODD requires an applicant who seeks to open an adult day care center to demonstrate that he or she has completed either (1) a bachelor's degree or (2) four years of full-time work as a supervisor at a facility that primarily serves individuals with developmental disabilities.

On February 14, 2013, Nikol Damman ("Damman")[2] began employment at PCS' adult day care center in Defiance, Ohio (the "Defiance Center"). During her term of employment with PCS, Damman and PCS entered into three non-competition agreements (the "Damman Agreements"): the first on February 14, 2013, the second on June 27, 2016, and the third on January 1, 2019.

On October 24, 2019, Defendants, Active Day, and PCS entered into the SPA, by which Defendants sold their ownership interests in PCS to Active Day for $12 million. SPA § 6.3 contains a non-competition covenant that bars Defendants from taking certain actions that compete with Active Day and PCS for seven years after the closing date of the sale.

---

[2] Damman was previously known as "Nikol Kinnersley." *See* Compl. Ex. 2.

In March 2020, Damman worked as Center Director at the Defiance Center. Plaintiffs allege that, at that time, Damman began preparing to open her own, competing adult day care center in Defiance. However, Damman lacked a bachelor's degree, and her work in the adult day care industry was confined to PCS. As a result, she needed proof of her term of employment at PCS to satisfy the DODD licensing requirements.

On March 8, 2020, Damman filed for an Ohio limited liability company certificate for her business, "We Are Limitless, LLC" ("WAL"), which provides competing services for individuals with developmental disabilities.

On March 24, 2020, Damman asked Defendants, who had been her supervisors at PCS, to provide a letter confirming her work at PCS so that she may apply to the DODD for agency approval. Wehr asked his attorney to draft and finalize a letter for Damman on behalf of Defendants, then send the letter to Damman to submit to the DODD. Wehr's attorney complied.[3] On the same day, PCS terminated Damman's employment. The Damman Agreements barred Damman from activity that competes with PCS for one year after the conclusion of her employment.

On April 16, 2020, Damman asked Wehr to provide additional information to further assist with her application to the DODD. As a result, on April 17, 2020, Wehr

_____

[3] The letter incorporated language drafted by Damman.

4

asked his attorney to prepare a revised version of the letter to the DODD. On April 20, 2020, Wehr's attorney sent Wehr a revised version of the letter that included the additional information requested.

Eventually, in June 2020, Damman opened a competing adult day care center, down the street from the Defiance Center. Plaintiffs subsequently learned that fifteen members and three employees from the Defiance Center had transferred to Damman's facility.

## PROCEDURAL HISTORY

In November 2020, Plaintiffs filed suit against Damman in the United States District Court for the Northern District of Ohio to enforce the Damman Agreements.[4] On June 30, 2022, the United States District Court for the Northern District of Ohio issued an order which held that the Damman Agreements are enforceable.[5]

On August 8, 2022, Plaintiffs filed the complaint in this case. Plaintiffs allege that, by assisting Damman with her application to the DODD, Defendants breached the non-competition covenants in SPA § 6.3 and tortiously interfered with the Damman Agreements.[6] On September 23, 2022, Defendants filed an answer to the complaint.[7]

---

[4] Compl. Ex. 5.
[5] *Id.*
[6] Compl.
[7] Defs. Gregory Wehr and Kenneth Albert's Answer to Compl. and Affirmative Defenses.

On May 2, 2023, ADSC, PCS, Damman, and WAL entered into an agreement to settle the litigation in the United States District Court for the Northern District of Ohio.[8]

On December 18, 2023, after the conclusion of discovery in this case, Defendants filed the Motion.[9] On February 7, 2024, Plaintiffs filed a brief in opposition to the Motion.[10] On March 5, 2024, Defendants filed a reply brief in further support of the Motion.[11] On May 22, 2024, the Court heard argument on the Motion.

## STANDARD OF REVIEW

The Court grants a motion for summary judgment when, "after viewing the record in a light most favorable to the non-moving party, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law."[12] When considering a motion for summary judgment, the Court "(i) construes the record in the light most favorable to the non-moving party; (ii) detects, but does not decide,

---

[8] Transmittal Aff. Margaret M. DiBianca Supp. Pls.' Answering Br. Opp'n Defs.' Mot. Summ. J. [hereinafter "DiBianca Aff."] Ex. 11.
[9] Defs.' Opening Br. Supp. Mot. Summ. J. [hereinafter "Opening Br."].
[10] Answering Br. Opp'n Defs.' Mot. Summ. J. [hereinafter "Answering Br."].
[11] Defs.' Reply Br. Supp. Mot. Summ. J. [hereinafter "Reply Br."].
[12] *New Wood Res. LLC v. Baldwin*, 2023 WL 4883924, at *6-7 (Del. Super. July 31, 2023) (quoting *CVR Refin., LP v. XL Specialty Ins. Co.*, 2021 WL 5492671, at *8 (Del. Super. Nov. 23, 2021)). "A genuine issue of fact exists if 'any rational trier of fact would infer that plaintiffs have proven the elements of a prima facie case.'" *Marshall v. Priceline.com Inc.*, 2010 WL 1068197, at *2 (Del. Super. Mar. 8, 2010) (quoting *Roberts v. Delmarva Power & Light Co.*, 2009 WL 222985, at *3 (Del. Super. Jan. 13, 2009)).

genuine issues of material fact; and (iii) denies the motion if a material fact is in dispute."[13]  If the moving party satisfies the burden to show that the motion is supported by the undisputed factual record, the burden shifts to the non-moving party to show that a genuine issue of material fact remains for trial.[14]

## LEGAL ANALYSIS

### A.  Breach of Contract

#### 1.  Plain Meaning of the Contract

First, Defendants assert that they are entitled to judgment as a matter of law on Plaintiffs' breach of contract claim because Defendants' conduct does not constitute "advis[ing]" or "render[ing] services to" Damman, as contemplated by SPA § 6.3.[15]  According to Plaintiffs, a genuine issue of material fact remains as to whether Defendants' communication, assistance, and overall conduct towards Damman constitute a breach of SPA § 6.3.  In addition, Plaintiffs argue that whether Defendants' alleged breach of the contract was material, presents an unresolved issue of fact.[16]

The elements of a breach of contract claim are "(1) the existence of a contractual obligation; (2) a breach of that obligation; and (3) damages resulting

---

[13] *New Wood Res. LLC,* 2023 WL 4883924, at *6-7.  In this analysis, the Court considers the record presented, not the evidence potentially possible, and does not engage in speculation.  *Id.*
[14] *Id.*
[15] Opening Br.; Reply Br.
[16] Answering Br.

from the breach."[17] Delaware courts follow the objective theory of contract interpretation, construing contracts as they would be understood by an "objective, reasonable third party."[18]

When the issue before the Court concerns contract interpretation, "summary judgment is appropriate only if the contract in question is unambiguous."[19] If the contract is unambiguous, the Court gives effect to the plain meaning of the contract's terms. A contract is unambiguous when "a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[20] Disagreement among the parties as to the meaning of the contract does not alone mean that the contract is ambiguous. Rather, a contract is ambiguous when "the provisions in controversy are reasonably or fairly susceptible of different interpretations."[21] Ambiguity is determined in "consideration of the instrument on the whole."[22]

---

[17] *Zenith Energy Terminals Joliet Holdings LLC v. CenterPoint Props. Tr.*, 2023 WL 615997, at *9 (Del. Super. Jan. 23, 2023) (quoting *Buck v. Viking Holding Mgmt. Co.*, 2021 WL 673459, at *3 (Del. Super. Feb. 22, 2021)). This third element has also been described as "causally related harm to the counterparty." *JER Hudson GP XXI LLC v. DLE Invs., LP*, 275 A.3d 755, 800 (Del. Ch. May 2, 2022).

[18] *Zenith*, 2023 WL 615997, at *9.

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Reybold Venture Grp. XVI LLC v. Cresswell*, 2014 WL 7010757, at *4 (Del. Super. Nov. 26, 2014).

SPA § 6.3(a) provides, in pertinent part, as follows:

> Noncompetition. For a period of seven (7) years immediately following the Closing Date, each Seller will not, directly or indirectly (including through an Affiliate), anywhere within the State of Ohio: (i) engage in any business or activity that competes with the Business or any business engaged in by Buyer or its affiliates (including the Company), or (ii) invest in, own, manage, operate, finance, control, *advise, render services to* or guarantee the obligations of any Person engaged in or planning to become engaged in any business or activity that competes with the Business or any business engaged in by Buyer or its affiliates.[23]

Neither Plaintiffs nor Defendants argue that SPA § 6.3(a) is ambiguous. The provision states that Defendants must not "advise" or "render services to" a competitor for seven years after the closing.[24] The parties dispute the application of this language, but the provision is sufficiently unambiguous that the Court may properly give effect to its plain meaning as written.

A genuine issue of material fact remains as to whether Defendants, by their conduct, "advise[d]" or "render[ed] services to" Damman pursuant to SPA § 6.3(a). After selling their ownership interests in PCS to Active Day, Defendants collaborated with Wehr's attorney and Damman to draft and finalize letters that supported Damman's application to the DODD to open a new, competing adult day care center in Defiance.[25] According to Plaintiffs, Wehr also told Damman that the

---

[23] Compl. Ex. 1 (emphasis added).
[24] *Id.*
[25] Both Wehr and Albert were active participants in the course of conduct at issue in this case. In response to Damman's email requesting a letter to support her DODD application, Wehr asked Albert whether they should contact Wehr's attorney first or "just do it." Albert responded that Defendants should correspond with the attorney but asserted that the two of them "can certainly

9

Damman Agreements were unenforceable. Whether these instances of conduct amount to a breach of SPA § 6.3(a) is an issue of fact that is properly reserved for a determination on the merits. Hence, for all of these reasons, Defendants are not entitled to summary judgment when considering their conduct in conjunction with the plain meaning of SPA § 6.3(a).

### 2. Causation

Second, Defendants argue that Plaintiffs have failed to show that the alleged injuries they sustained based on breach of contract were proximately caused by Defendants, rather than third parties.[26] Plaintiffs insist that proximate causation is not an element of a breach of contract claim. Alternatively, Plaintiffs argue that if proximate causation was considered part of the resulting damages element of breach of contract, it has been satisfied because no superseding cause broke the causal chain of events in this case. Also, Plaintiffs assert that these issues of causation should be reserved for a determination on the merits.[27]

Success on a breach of contract claim requires the plaintiff to "demonstrate with reasonable certainty that defendant's breach caused the loss."[28] However, this showing is not required at the summary judgment stage. On a motion for summary

---

compose [a] letter confirming employment while we owned the company." Subsequently, Wehr sent instructions to the attorney. Transmittal Affidavit Michael D. DeBaecke Supp. Defs.' Opening Br. Supp. Mot. Summ. J. [hereinafter "DeBaecke Aff."] Ex. K.
[26] Opening Br.; Reply Br.
[27] Answering Br.
[28] *LaPoint v. AmerisourceBergen Corp.*, 2007 WL 1309398, at *7 (Del. Ch. May 1, 2007).

judgment on a breach claim, the plaintiff "may satisfy [its] burden merely by taking the causation of damages out of the area of speculation, and it is not necessary to show with absolute certainty that defendant's action caused plaintiff's harm."[29] Under Delaware law, issues of causation "are questions for the trier of fact."[30]

The Court is satisfied that Plaintiffs have made a demonstration sufficient to take the causation of damages for breach of contract beyond the realm of mere speculation. Plaintiffs allege that they suffered lost profits because Defendants helped Damman gain regulatory approval to open a new adult day care center that competes with Plaintiffs' Defiance Center. They claim that if Defendants had not helped Damman obtain this regulatory approval, she could not have opened her competing facility, and Plaintiffs' Defiance Center would have made greater profits. These assertions should properly be placed before a trier of fact and tested for accuracy and credibility. The logical sequencing of these alleged facts, culminating in Plaintiffs' damages, is not so untenable or speculative as to be disposed of as a matter of law at the summary judgment stage. A question of fact remains as to whether Defendants' conduct caused the harm alleged by Plaintiffs, and whether Plaintiffs have satisfied the element of causation is a determination properly reserved

---

[29] *Id.*

[30] *Kling Meats, Inc. v. Balt. Spice Co.*, 1988 WL 130370, at *2 (Del. Super. Nov. 23, 1988) ("Proximate cause and reasonably foreseeability of an injury are questions for the trier of fact.").

for the trier of fact.  Hence, Defendants are not entitled to summary judgment based on Plaintiffs' alleged failure to demonstrate causation.

### 3. Damages

Third, Defendants argue that Plaintiffs' claim for damages for breach of contract is defective because it is speculative, lacks support from case law, and fails to account for the full factual record.[31]  Defendants also assert that Plaintiffs failed to properly apportion the damages among all the allegedly liable parties.  Further, Defendants contend that Plaintiffs, in their damages calculation, failed to account for the full amount that Plaintiffs received in settlement payments from Damman.[32]

Plaintiffs respond that their damages claim raises issues that are not properly resolved by summary judgment.  Plaintiffs emphasize that the amount of damages need not be demonstrated with mathematical certainty at this stage in the litigation.[33]  Further, Plaintiffs argue that, at this stage of the proceedings, they need not apportion the damages between Wehr and Albert or account for the settlement payments, because Defendants have not been deemed joint tortfeasors.[34]

---

[31] Opening Br.; Reply Br.  Defendants also argue that Plaintiffs are required to apportion the harm amongst all of the allegedly culpable actors.  Plaintiffs cannot apportion culpability for breach of SPA § 6.3 to entities other than Albert and Wehr because they are the only parties to the SPA other than Active Day and PCS.
[32] Opening Br.; Reply Br.
[33] Answering Br.
[34] *Id.*  Plaintiffs also assert that whether Defendants qualify as joint tortfeasors should not be determined at the summary judgment stage in the litigation.  *Id.*

At the summary judgment stage in the litigation, "the non-movant need only present some credible evidence that supports a claim for damages."[35] The Court "cannot resolve factual issues on a motion for summary judgment."[36] Conflicts in the evidence are resolved by the trier of fact.[37]

In the context of a breach of contract claim, "a plaintiff is entitled to compensation sufficient to place the non-breaching party in the same position as if the contract had been performed."[38] Damages are awarded in relation to "the loss actually sustained as a result of the breach of the contract."[39] But the plaintiff can also recover for incidental or consequential damages that arose from the breach.[40] For instance, Delaware courts allow recovery for lost profits but sometimes bar recovery for lost future profits and lost customers because they can be speculative.[41] Lost profits can be established by "concrete data of past profit history,"[42] in which

---

[35] *Medlink Health Sols., LLC v. JL Kaya, Inc.*, 2024 WL 1192781, at *5 (Del. Super. Mar. 20, 2024).

[36] *Am. Bottling Co. v. BA Sports Nutrition, LLC*, 2021 WL 6068705, at *13 (Del. Super. Dec. 15, 2021).

[37] *Id.*

[38] *Devincentis v. Eur. Performance, Inc.*, 2012 WL 1646347, at *3 (Del. Super. Apr. 17, 2012).

[39] *Id.*

[40] *Id.*

[41] *Crowell Corp. v. Himont USA, Inc.*, 1994 WL 762663, at *3 (Del. Super. Dec. 8, 1994) ("Under Delaware law, consequential damages in the form of goodwill, lost future profits, and lost customers are not awarded in breach of contract actions."); *Tanner v. Exxon Corp.*, 1981 WL 191389, at *3 (Del. Super. July 23, 1981) (granting summary judgment against claim for lost future profits). *Cf. All Pro Maids, Inc. v. Layton*, 2004 WL 1878784, at *12 (Del. Ch. Aug. 9, 2004) (awarding damages for future projected lost profits); *Khushaim v. Tullow Inc.*, 2017 WL 3500285, at *4 (Del. Super. Aug. 16, 2017) (denying motion for summary judgment against claim for future profits damages based on breach of contract).

[42] *Crowell Corp.*, 1994 WL 762663, at *3.

case damages are generally limited to "profits which might have been made pursuant to the performance of the particular contract sued on, during the period for which the contract was to run."[43]

Here, Plaintiffs' breach claim survives summary judgment because Plaintiffs have presented credible evidence to support a claim for damages. A genuine issue of material fact remains as to the extent of Plaintiffs' alleged damages. In the complaint, Plaintiffs assert that Defendants' alleged breach of SPA § 6.3(a) caused Plaintiffs "to suffer damages and financial loss" in an amount "to be determined at the time of trial."[44] Plaintiffs' expert Rebekah Smith ("Smith"), a forensic accountant, concluded that Plaintiffs are entitled to approximately $1.7 million in damages for profits lost due to Defendants' alleged breach of SPA § 6.3.

Looking ahead to trial, however, Plaintiffs' damages calculation contains some potential defects. As previously mentioned, Delaware courts have expressed skepticism about lost future profits and lost customers as bases for damages for breach of contract because they are generally, by nature, speculative.[45] Plaintiffs' damages claim is based, in part, on lost customers and lost future profits, both

---

[43] *Id.* ("The Delaware law does not allow future profits as damages for a period beyond the termination date of the contract sued upon since termination automatically extinguishes the relationship between the parties.").

[44] Compl.

[45] Support from concrete data and a limitation to profits based on the contract at issue can help bring these sorts of damages claims beyond the realm of speculation. *See supra* notes 42-43 and accompanying text.

14

disfavored categories of damages in Delaware. For instance, in her report, Smith describes Plaintiffs' lost profits as entirely based on the lost current and prospective customers of Plaintiffs' Defiance Center. Smith also states that "a portion of the Plaintiffs' lost profits occur in the future."[46] She included these future lost profits in the damages calculation, reducing them to present value by applying a ten-percent discount rate. Notably, Smith calculated Plaintiffs' lost profits from July 1, 2020, to December 31, 2042.[47] A glaring defect in her calculation is that SPA § 6.3(a) survives for only seven years, from October 24, 2019, to October 24, 2026.[48] After that time, Defendants can freely compete with Plaintiffs. Accordingly, Plaintiffs cannot recover damages for lost future profits, defined as profits that Plaintiffs might accrue after October 24, 2026.

Separately, the parties' arguments about the application of the collateral source rule are premature. The rule applies to tortfeasors.[49] Under the collateral source rule, which is "firmly embedded" in Delaware law,[50] "a tortfeasor may not benefit from any money the injured party may receive from sources other than the

---

[46] DiBianca Aff. Ex. 13.
[47] *Id.*
[48] Compl. Ex. 1.
[49] The tortfeasors need not be *joint* tortfeasors. *Neylon v. Zabel*, 2020 WL 6277733, at *7 (Del. Super. Oct. 23, 2020) ("Because this Court finds that Defendants and Johnston are not joint tortfeasors, and the collateral source rule does apply to this action, [the plaintiff's] Motion *in Limine* to exclude all evidence relating to the PI Action, including the Release, is granted.").
[50] *Stayton v. Del. Health Corp.*, 117 A.3d 521, 527 (Del. 2015).

15

tortfeasor."[51]  The tortfeasor "cannot mitigate damages by claiming the benefit of the ability of the injured party to recover, from a third party, expenses related to the injury."[52]  As Plaintiffs correctly state, at this time, Defendants have not been deemed tortfeasors in this litigation or in the Ohio litigation.  However, the factual record sheds some light on what may be considered in the calculation of damages in this case.  On May 2, 2023, ADSC, PCS, Damman, and WAL entered into a settlement agreement, by which Damman and WAL paid ADSC and PCS a lump-sum amount to dismiss their claims in the federal litigation in Ohio.[53]  In the instant case, to reach the damages calculation posited by Plaintiffs, Smith subtracted the amount that Damman and WAL paid to ADSC and PCS under the Ohio settlement agreement from the total amount of damages that Plaintiffs could conceivably claim.[54]  If Plaintiffs succeeded on the merits on a tort law claim against Defendants in this Court, thereby deeming them tortfeasors, the collateral source rule would apply.

---

[51] *Onusko v. Kerr*, 880 A.3d 1022, 1024 (Del. 2005).  The collateral source rule "resolves what may be competing equities in favor of the innocent injured plaintiff receiving a windfall, rather than an admitted or adjudged tortfeasor bearing less than the full cost of his or her negligent conduct." *In re Rural/Metro Corp. Stockholders Litig.*, 102 A.3d 205, 244 (Del. Ch. 2014) (quoting *Med. Ctr. Del., Inc. v. Mullins*, 637 A.2d 6, 10 (Del. 1994)).

[52] *Miller v. State Farm Mut. Auto. Ins. Co.*, 993 A.2d 1049, 1053 (Del. 2010) (cleaned up).

[53] DeBaecke Aff. Ex. U.

[54] DiBianca Aff. Ex. 13.  Plaintiffs' damages expert lacked clarity about the precise sum to be paid under the Ohio settlement agreement.  In the text of her report, Smith stated that "the Plaintiffs' damages in this litigation are appropriately reduced by [one-third of the] compensatory damages that one or more of the Plaintiffs recovered from Ms. Damman and/or WAL through the settlement of separate litigation." *Id.*  In a footnote, she added that "[i]f it is determined that [the other two-thirds] of the settlement proceeds is also an offset to the damages in this case, the Plaintiffs' damages would be reduced" further by that amount. *Id.*

This rule would bar Defendants from mitigating their damages by pointing to the amounts that Plaintiffs received under the Ohio settlement agreement. The collateral source rule excludes such payments received from third parties, like Damman and WAL, when calculating tort-based damages. Hence, consistent with the foregoing analysis, Defendants are not entitled to summary judgment on Plaintiffs' breach of contract claim based on defects in Plaintiffs' calculation of damages at this stage in the proceedings.

## B. Tortious Interference with Contract

Fourth, Defendants argue that they are entitled to judgment as a matter of law on Plaintiffs' tortious interference with contract claim because Plaintiffs have failed to allege that any wrongful conduct was perpetrated by Defendants.[55] Plaintiffs disagree and highlight their view of the record, that Defendants were aware of the Damman Agreements and that their intentional assistance to Damman with her DODD application was a significant factor in causing Damman's breaches of the Damman Agreements. According to Plaintiffs, these assertions raise genuine issues of fact that preclude summary judgment on the tortious interference claim.[56]

When the non-moving party bears the burden of proof for the claim, "summary judgment may be granted if the moving party can demonstrate a complete

---

[55] Opening Br.; Reply Br.
[56] Answering Br.

failure of proof concerning an essential element of the non-moving party's case."[57] A tortious interference with contract claim requires the plaintiff to show "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."[58]

Here, Defendants have not demonstrated that Plaintiffs completely failed to substantiate any essential element of their tortious interference claim. In the complaint, Plaintiffs allege that Defendants tortiously interfered with the Damman Agreements by helping Damman complete her application to the DODD, toward the goal of competing with Plaintiffs. More specifically, they assert that (1) Damman and PCS entered into the Damman Agreements; (2) Defendants knew about the Damman Agreements; (3) Defendants' intentional assistance to Damman was a significant factor in facilitating her breach of the Damman Agreements; (4) Defendants' assistance to Damman was without justification; and (5) Plaintiffs suffered financial injury from Defendants' conduct. Plaintiffs support these

---

[57] *Grand Ventures, Inc. v. Paoli's Rest., Inc.*, 1996 WL 30022, at *2 (Del. Super. Jan. 4, 1996).

[58] *Encore Preakness, Inc. v. Chestnut Health & Rehab. Grp., Inc.*, 2021 WL 3280484, at *3 (Del. Super. July 20, 2021). The Court weighs seven factors to determine whether the defendant's act was without justification: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." *Cousins v. Goodier*, 283 A.3d 1140, 1166 (Del. 2022) (quoting *WaveDivision Holdings, LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012)).

assertions with information from the factual record, including the Damman Agreements, March 2020 emails between Defendants, Damman, and Wehr's attorney, and the report on damages by Plaintiffs' expert.  Additionally, even though Defendants had Wehr's attorney draft the letters for Damman, rather than drafting these letters themselves, they do not avoid any possible tort liability in this case. Attorneys serve as agents of their clients.  A client is generally bound by the actions of his attorney, so long as the attorney acted within the scope of his discretion.[59] Defendants directed Wehr's attorney to draft and finalize these letters,[60] and they are bound by his course of conduct within the scope of that instruction.   Hence, Defendants are not entitled to summary judgment on Plaintiffs' tortious interference claim.

---

[59] *Zutrau v. Jansing*, 2014 WL 6901461, at *4 (Del. Ch. Dec. 8, 2014); Grace M. Giesel, *Client Responsibility for Lawyer Conduct: Examining the Agency Nature of the Lawyer-Client Relationship*, 86 Neb. L. Rev. 346, 350 (2007) ("Attorneys are declared to be agents, and clients are declared to be principals, but general agency principles may or may not apply to them.").  An attorney, as his client's advisor, may generally "provide counsel to his client without fear that the advice will give rise to a tortious interference claim."  *Mesirov v. Enbridge Energy Co.*, 2018 WL 4182204, at *17 (Del. Ch. Aug. 29, 2018); Restatement (Second) of Torts § 772 (1979).
[60] Wehr and Albert conferred about drafting a letter for Damman, the two agreed to forward the matter to Wehr's attorney for completion, then Wehr instructed his attorney to do so.  Both Wehr and Albert actively participated in the conduct at issue in this action.  *See supra* note 25 and accompanying text.

**CONCLUSION**

There is "no absolute right to summary judgment."[61] Summary judgment is "a harsh remedy that affects a party's substantive rights."[62] The remedy "must be cautiously invoked" and never used to resolve disputes of fact.[63] The Court may deny a motion for summary judgment based on its conclusion, "upon preliminary examination of the facts, that it found it desirable to inquire thoroughly into all the facts in order to clarify the application of the law."[64] That is the case here. For the foregoing reasons, Defendants' Motion for Summary Judgment is **DENIED.**

**IT IS SO ORDERED,** this 27th day of June, 2024.

_____
Sheldon K. Rennie, Judge

[61] *TIBCO Software, Inc. v. nThrive Revenue Sys., LLC*, 2019 WL 6216229, at *4 (Del. Super. Nov. 21, 2019).

[62] *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012).

[63] *Id.*

[64] *Cross v. Hair*, 258 A.2d 277, 279 (Del. 1969) (quoting *Alexander Indus., Inc. v. Hill*, 211 A.2d 917, 918 (Del. 1965)); *TIBCO Software*, 2019 WL 6216229, at *4 (quoting *Williams v. Geier*, 671 A.2d 1368, 1388-89 (Del. 1996)) ("The Court should not grant summary judgment 'if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.'").